FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2013 OCT 18 AM 10: 54

CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 113-007 |
| | ) | |
| BRIAN KEITH ALEXANDER | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The indictment charges Defendant Brian Keith Alexander ("Alexander") with possession with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c), and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). (Doc. no. 1.) Before the Court is Mr. Alexander's motion to suppress "any and all evidence illegally seized by law enforcement as a result of his detention and subsequent search of his vehicle by law enforcement on July 9, 2012." (Doc. nos. 29, 32.[1]) The Court held an evidentiary hearing on September 26, 2013 and heard testimony from Investigator Julio Concepcion of the Richmond County Sheriff's Office, and the Court continued the hearing on October 8, 2013 to hear the testimony of Charles M. Frails, who was sitting in the passenger's seat of Mr. Alexander's car during the events at issue. (Doc. no. 38.) Having considered all

---

[1] Although the Court's recommendation to deny the request for suppression applies to Alexander's preliminary and particularized motions, for ease of reference, the Court will refer to these motions as a single motion to suppress. (See doc. nos. 29, 32.)

arguments made by the parties, both oral and written, along with the affidavit of Mr. Alexander and the testimony of Messrs. Concepcion and Frails, for the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that the motion be **DENIED**.

I. FACTS

On July 9, 2012, Invs. Julio Concepcion and Michael Dodaro with the Richmond County Sheriff's Office Narcotics Division patrolled the area of Shirley Avenue in response to numerous drug complaints on the drug tip hotline, mainly concerning the 2100 block of Shirley Avenue. (Court's recording system, *For The Record*, (hereinafter "FTR"), 10:13:26 – 14:10.) They patrolled this area in an unmarked Dodge Charger, driven by Inv. Dodaro, and they were wearing service-issued guns and vests that read "Sheriff" across the front in bright yellow. (FTR 10:14:12 – 14:56.) As they approached the dead end of Shirley Avenue, they saw Mr. Alexander and Mr. Frails sitting in a 2002 Lincoln LS parked on the curb in front of 2101 Shirley Avenue. (FTR 10:15:00 – 15:35.) The car was turned off, and the windows were rolled down. (Id.) Mr. Alexander was in the driver's seat, and Mr. Frails was in the passenger's seat. (See FTR 2:51:10 – 52:15.)

According to Inv. Concepcion, Inv. Dodaro parked in the road and parallel to Mr. Alexander's vehicle, along the driver's side and more than three to four feet away. (FTR 10:15:40 – 16:10; 10:29:40 – 30:10.) There were no vehicles either in front or behind Mr. Alexander's vehicle. (FTR 10:16:07 – 16:15; 10:28:40 – 28:53.) The investigators immediately exited the Charger, with Inv. Dodaro approaching the driver's side of Mr. Alexander's vehicle and Inv. Concepcion approaching the passenger side. (FTR 10:16:20 – 16:35.) Standing on the passenger's side of Mr. Alexander's vehicle, Inv. Concepcion noticed a clear plastic bag filled with pills in the center console within the

first minute of speaking with Mr. Frails about what they were doing in the area. (FTR 10:17:00 – 17:16; 10:39:00 – 39:33.) Based on his experience, Inv. Concepcion thought the bag contained cocaine because of the way it was bagged and because the pills left a residue on the bag. (Id.) After Inv. Concepcion observed the clear plastic bag, he asked Mr. Frails to explain why there was cocaine in the car, and the investigators asked Messrs. Alexander and Frails to step out of the vehicle. (FTR 10:17:35 – 17:42.)[2]

Further investigation showed that the firearm was reported stolen during a burglary, Mr. Alexander was a convicted felon, the vehicle was registered to Mr. Alexander, and the plastic bag contained oxycodone pills. (FTR 10:19:30 – 20:25; 10:24:10 – 24:20.) Mr. Frails testified that neither the drugs nor gun were his and that Mr. Alexander promised Mr. Frails in two subsequent conversations that he would take full responsibility and exonerate Mr. Frails. (FTR 2:55:00 – 55:40.) Inv. Concepcion testified that during the initial encounter, which lasted about 3-5 minutes, at no point did Mr. Alexander attempt to leave the scene, express any desire to do so, or exhibit any signs of such a desire. (FTR 10:24:45 – 26:20.) During this initial encounter, the investigators did not display force in any way or display their weapons at any point, did

---

[2]Inv. Concepcion is unclear concerning what happened between Inv. Dodaro and Mr. Alexander on the other side of the vehicle during the time that Inv. Concepcion first spotted the pill bag and asked Mr. Frails about it. Inv. Concepcion testified at the hearing that he heard Inv. Dodaro ask Mr. Alexander about the gun on the floorboard before the investigators asked Messrs. Alexander and Frails to exit the vehicle. (See FTR 10:17:16 – 17:35; 10:18:55 – 19:10; 10:32:30 – 34:10.) In his verification of the government's response to Mr. Alexander's motion, however, Inv. Concepcion stated that Inv. Dodaro first saw the gun after Messrs. Alexander and Frails exited the vehicle. (See doc. no. 34-1.) Inv. Concepcion is consistent and unequivocal in his testimony that he personally observed the drugs in plain view in the center console from his vantage point outside the passenger's side window before the investigators asked Messrs. Alexander and Frails to exit the vehicle.

3

not touch Mr. Alexander or Mr. Frails before noticing the contraband, nor speak in loud voices or use any profanity. (Id.)

Mr. Frails agrees that the investigators parked in the street next to Mr. Alexander's vehicle, which was parked on the curb, and that the investigators exited their vehicle and approached both sides of Mr. Alexander's vehicle. (FTR 2:51:10 – 52:15.) Mr. Frails recalled a vehicle parked approximately one foot in front of Mr. Alexander's vehicle, which is inconsistent with Inv. Concepcion's testimony, but he agrees with Inv. Concepcion that there were no vehicles parked behind Mr. Alexander's vehicle. (FTR 2:38:35 – 39:02.) Mr. Frails also testified that the investigators were "flying down the street" and pulled up so close to Mr. Alexander's vehicle that if Mr. Alexander had opened his door, his door would have hit the investigators' vehicle. (FTR 2:39:24 – 40:10.) Nevertheless, Mr. Frails agreed that the investigators exited their vehicle and inquired of both passengers what they were doing, and that Inv. Concepcion questioned him for no more than five minutes. (FTR 2:40:10 – 41:05.) Mr. Frails agrees that he and Mr. Alexander had no intention to leave because they were waiting for his cousin to arrive. (FTR 2:49:13 – 49:23.)

Mr. Frails also testified that, during the initial encounter, Inv. Concepcion leaned his head inside the passenger's side window of Mr. Alexander's car, and that Inv. Dodaro was leaning on the car. (FTR 2:41:20 – 41:58.) Inv. Concepcion was never asked whether he or Inv. Dodaro leaned on Mr. Alexander's car. Mr. Frails recalled that Inv. Dodaro asked Mr. Alexander if there were any guns or drugs in the car, to which Mr. Alexander responded there were not. (FTR 2:42:00 – 42:15.) Although Inv. Concepcion never mentioned this, Mr. Frails testified that, after Inv. Dodaro asked Mr. Alexander if

4

there were any drugs or guns in the car, Inv. Dodaro asked Mr. Alexander for consent to search the car and Mr. Alexander consented. (FTR 2:42:15 – 42:35; 2:54:05 – 54:40.) Mr. Alexander "must have moved" after consenting to the search, which led the investigators to "[draw] down" on Mr. Frails and Mr. Alexander because there was a gun on the floorboard. (Id.) Contradicting this testimony, Mr. Frails then testified that he did not believe the investigators saw the drugs or gun in the vehicle until they searched the vehicle after telling Mr. Frails and Mr. Alexander to exit the vehicle. (FTR 2:42:40 – 42:53.)[3] However, Mr. Frails corroborated Inv. Concepcion's testimony that the drugs were in the center console, as shown in photographs admitted as exhibits at the hearings. (FTR 2:52:40 – 52:45; Gov. Ex. 1.)

In the affidavit submitted in support of his motion, Mr. Alexander states generally that he never consented to a search of his vehicle and at no time during the encounter did he feel free to leave. (See generally doc. no. 32-2.)

## II. DISCUSSION

### A. Supression Standard

A defendant seeking the suppression of evidence bears the initial burden of showing that he was subjected to an unlawful search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden then shifts to the government to show that the encounter was consensual or that

---

[3]Like Inv. Concepcion, Mr. Frails is unclear concerning what happened between Inv. Dodaro and Mr. Alexander on the other side of the vehicle during the time that Inv. Concepcion first spotted the pill bag and asked Mr. Frails about it. As indicated above, Mr. Frails initially testified that the investigators noticed the gun before they asked him and Mr. Alexander to exit the vehicle. (FTR 2:42:15 - 42:353; 2:54:05 – 54:40.) Later in his testimony, Mr. Frails stated that he did not believe the investigators found the gun until they searched the vehicle after Messrs. Alexander and Frails exited. (FTR 2:42:40 – 42:53.)

the search or seizure was justified. See United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008); United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006). As correctly noted by both parties in their respective briefs, police-citizen encounters generally fall within one of three categories: (1) exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; or (3) full-scale arrests. Perez, 443 F.3d at 777.

> Regarding the first category, it is well-established that:
>
> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage - provided they do not induce cooperation by coercive means.

Id. at 777-78 (citing United States v. Drayton, 536 U.S. 194, 200-01 (2002)); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[M]ere police questioning does not constitute a seizure."). For the purposes of Fourth Amendment analysis, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). A person is not "seized" if "a reasonable person would feel free to terminate the encounter" with the police. Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006). Factors relevant to this "free to leave" inquiry include whether a citizen's path is blocked or impeded, the display of weapons, and any physical touching of the suspect. Id. However, absent physical force, a seizure does not occur if the subject does not yield to a show of authority. California v. Hodari D., 499 U.S. 621, 625-26 (1991).

Once the interaction rises to the level of a brief seizure or investigatory detention, the officer must have reasonable, articulable suspicion that the individual has engaged in or is about to engage in criminal activity. Terry, 392 U.S. at 24; United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) ("[E]ven in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.") Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007); see also United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004).

## B. Suppression is Not Warranted Under the Fourth Amendment

Mr. Alexander asserts that the July 9, 2012 encounter was an impermissible seizure under the Fourth Amendment from the outset because it was not supported by reasonable suspicion, and that "any and all" evidence seized as a result of the encounter should therefore be suppressed. (See generally doc. no. 32.) The government agrees that a seizure occurred, but only after the investigators saw the suspected cocaine and weapon in plain view and asked Messrs. Frails and Alexander to exit the vehicle. (See generally doc. no. 34.) In light of the foregoing standards and arguments, the key question is

whether a Fourth Amendment seizure occurred at any time before Inv. Concepcion spotted the bag of pills in the center console of Mr. Alexander's car.

Here, contrary to Mr. Alexander's argument, the initial portion of the July 9, 2012 encounter was the type of consensual, non-coercive encounter that requires no justification under the Fourth Amendment under the "free to leave" inquiry set forth in Miller. Invs. Concepcion and Dodaro merely parked alongside Mr. Alexander's car, walked to each side of the car, and asked Messrs. Frails and Alexander routine questions about their presence in the neighborhood. It is undisputed that the time between parking the patrol car and approaching Mr. Alexander's car was very brief, the suspects had their windows down, the investigators did not draw their weapons, did not ask for identification, and did not give any directions to Mr. Alexander or Mr. Frails during the initial part of the encounter.

Police action such as this is insufficient to establish a Fourth Amendment seizure. See Perez, 443 F.3d at 777 ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street . . . and putting questions to them . . . . Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . ."); Miller, 458 F.3d at 1257 (finding no seizure where the officer parked his patrol car behind the suspect's vehicle, the time between parking and approaching the suspect's vehicle was very brief, the suspect voluntarily rolled his window down, the officer did not draw his weapon, did not give the suspect any directions, and did not activate his roof lights); United States v. Edwards, 105-CR-0097-WSD-JFK, 2007 WL 2479288 (N.D. Ga. Aug. 28, 2007) aff'd, 307 F. App'x 340 (11th

8

Cir. 2009) (*per curiam*) (finding no seizure where officers, who were dressed in narcotics unit uniforms, walked up on each side of a vehicle and did not display their weapons).

Mr. Alexander makes much of Mr. Frails' testimony that a truck was parked in front of Mr. Alexander's vehicle. Obstruction of a vehicle weighs in favor of a finding that a seizure occurred, but it is not dispositive. See United States v. Flores-Uriostegui, 1:09-CR-00438-JEC, 2012 WL 1884036, at *2, *7 (N.D. Ga. May 22, 2012) (partially blocking rear of suspect's vehicle, which would have made it difficult, if not impossible, for the defendants to move their car is not a *per se* seizure that must be supported by reasonable suspicion) (citing Miller, 458 F.3d at 1258-59). Inv. Concepcion testified that Mr. Alexander's car was not obstructed in the least bit because there were no cars parked either behind or in front of Mr. Alexander's vehicle. Mr. Frails agreed that there was no car behind Mr. Alexander's car, but did contradict Inv. Concepcion by testifying that a car was parked in front of Mr. Alexander's car. The Court does not believe Mr. Frails' testimony on this point, as explained below, and even if it did, the mere fact that a truck was parked in front of Mr. Alexander's vehicle would not change the outcome.

Mr. Frails' testimony concerning the position of the cars and whether Mr. Alexander's vehicle was blocked in the front is not credible because it is riddled with inconsistencies.[4] First, Mr. Frails testified unequivocally that Inv. Dodaro parked so

---

[4] Credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Williams, No. 12-15313, 2013 WL 5461846, at *7 (11th Cir. Oct. 2, 2013) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must consider not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749-750 (citations omitted).

close to Mr. Alexander's car that there would have been no room for either Mr. Alexander or Inv. Concepcion to open their respective doors. (FTR 2:39:24 – 40:10.) However, Mr. Frails also testified unequivocally that Inv. Concepcion did, in fact, exit from his passenger-side door, showing that there was enough room to open at least one of the doors. (FTR 2:40:10 – 41:05.) Furthermore, the government presented photographic evidence showing a considerable distance between Mr. Alexander's car and the patrol car parked beside it. (See Gov. Exs. 6,9.) Second, Mr. Frails testified that a truck was parked in front of Mr. Alexander's car, parallel to the curb. (FTR 2:38:35 – 39:02.) However, Mr. Alexander was parked just behind the driveway of 2101 Shirley Avenue and it is highly unlikely that a vehicle would have completely blocked the driveway by parking perpendicular to it, especially when photographs of the scene show ample curbside parking beyond the driveway. (See Gov. Exs. 10-14.) Lastly, the Court must also consider Mr. Frails' interests in the matter and how that may affect his testimony. Mr. Frails testified that he was arrested and charged by the state because of these very events and that Mr. Alexander promised to accept full responsibility and exonerate Mr. Frails. (FTR 2:55:38 – 55:55.) Therefore Mr. Frails has an interest in not only helping Mr. Alexander, but also himself by testifying that the stop was unlawful. For all of these reasons, the Court finds Inv. Concepcion's testimony that no vehicle was parked in front of Mr. Alexander's car more credible than Mr. Frails' testimony that a truck was parked in front of it.

Furthermore, even if the Court were to believe Mr. Frails' testimony on this point, it would still not change the outcome because even Mr. Frails agreed that no vehicle was parked behind Mr. Alexander's car. It is thus undisputed that Mr. Alexander was free to

leave at any time by merely backing his car up. Messrs. Alexander and Frails did not ask to leave, attempt to leave, express any desire to do so, or exhibit any signs of such a desire. (FTR 10:24:45 – 26:20.) In fact, Mr. Frails testified that he and Mr. Alexander had no intention of leaving until Mr. Frails' cousin arrived. (FTR 2:49:13 – 49:23.) In addition, as discussed in detail above, all of the remaining facts show that the initial encounter was casual, non-coercive, and bereft of any threatening or intimidating behavior by the investigators. No seizure thus occurred prior to Inv. Concepcion seeing the bag of pills. See Flores-Uriostegui, 1:09-CR-00438-JEC, 2012 WL 1884036, at *7.

Nor does it matter that, according to Mr. Frails, Inv. Dodaro leaned on the car and Inv. Concepcion leaned his head inside the passenger window. This is not a sufficient "show of authority" to turn the situation into a non-coercive encounter. See United States v. Lopez-Guzman, 246 F. Supp. 2d 1155, 1162 (D. Kan. 2003) aff'd, 145 F. App'x 627 (10th Cir. 2005) ("A reasonable person in defendant's situation would not have believed he had to stay and answer questions because of the officer's choice to lean on and minimally into the car.")

Likewise, Mr. Alexander's affidavit does not provide any evidence to support that he was seized at any time before the investigators asked him and Mr. Frails to exit the vehicle. Mr. Alexander presented his account of the encounter in an untested affidavit that is devoid of any factual detail and merely recites the standard to suppress evidence. (See doc. no. 32-2.) The factual details provided by Inv. Concepcion and Mr. Frails bely the generalized conclusions voiced by Mr. Alexander, for the reasons discussed above.

For all of these reasons, the earliest point at which Mr. Alexander was seized for Fourth Amendment purposes was when the investigators asked him and Mr. Frails to exit

the vehicle. Accordingly, everything the investigators observed prior to that point may provide a basis for reasonable suspicion. See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("Officers can consider everything that happened up to [the point of seizure] to establish reasonable suspicion."). Here, it is undisputed that Inv. Concepcion viewed suspected cocaine in a plastic bag in the center console prior to ordering Messrs. Alexander and Frails to exit the vehicle. Indeed, Mr. Frails confirmed that the drugs were located in this same compartment, in a clear plastic bag, and photographs of the car confirm that the drugs were in plain view in this location. This alone was sufficient to give rise to at least reasonable suspicion that criminal activity was afoot, which is all that is required to justify Mr. Alexander's initial seizure.[5] See United States v. Blackley, 439 F. App'x 803, 805 (11th Cir. 2011) (*per curiam*) ("[T]he officers had at least reasonable suspicion that criminal activity was afoot at the moment when one officer . . . saw what he believed to be crack cocaine and plastic bags on the floor of the driver's side of the vehicle.")

### III. CONCLUSION

In sum, the Court finds that the initial portion of the July 9, 2012 incident was a non-coercive police-citizen encounter rather than a seizure requiring justification under the Fourth Amendment. The Court further finds that at the time Mr. Alexander was seized, the seizure was supported by reasonable suspicion such that it did not violate his

---

[5] Of course, once the investigators saw drugs in plain view, they not only had reasonable suspicion that criminal activity was afoot, but they also had probable cause to search the vehicle and arrest Messrs. Frails and Alexander. See Edwards, 307 F. App'x 340, 344 (finding that officers had probable cause to arrest suspect based on officer's viewing of what appeared to be a bag of marijuana in plain view between the front seats of the car). Defendant does not contend otherwise.

Fourth Amendment rights. Accordingly, the Court **REPORTS** and **RECOMMENDS** that Mr. Alexander's motion to suppress be **DENIED**. (Doc. nos. 29, 32.)

SO REPORTED and RECOMMENDED this 18th day of October, 2013, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE